# Exhibit A

Civil Action Cover Sheet - Case Initiation
12-Person Jury
(12/01/20) CCL 0520

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

CF Entertainment, Inc., a California corporation; Entertainment Studios
Networks, Inc., a California corporation; Weather Group, LLC, a Delaware
limited liability company; and Weather Group Television, LLC, a Georgia
limited liability company,

v.

The Nielsen Company (US), LLC, a Delaware limited liability company

No. _____

2022L002556

Hearing Date: 7/14/2022 9:30 AM

FILED DATE: 3/16/2022 11:14 AM    2022L002556

FILED
3/16/2022 11:14 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
17106603

**(FILE STAMP)**

## CIVIL ACTION COVER SHEET - CASE INITIATION

A Civil Action Cover Sheet - Case Initiation shall be filed with the
complaint in all civil actions. The information contained herein
is for administrative purposes only and cannot be introduced into
evidence. Please check the box in front of the appropriate case
type which best characterizes your action. Only one (1) case type
may be checked with this cover sheet.

Jury Demand ☒ Yes   ☐ No

### PERSONAL INJURY/WRONGFUL DEATH

CASE TYPES:
- ☐ 027 Motor Vehicle
- ☐ 040 Medical Malpractice
- ☐ 047 Asbestos
- ☐ 048 Dram Shop
- ☐ 049 Product Liability
- ☐ 051 Construction Injuries
  (including Structural Work Act, Road
  Construction Injuries Act and negligence)
- ☐ 052 Railroad/FELA
- ☐ 053 Pediatric Lead Exposure
- ☐ 061 Other Personal Injury/Wrongful Death
- ☐ 063 Intentional Tort
- ☐ 064 Miscellaneous Statutory Action
  (Please Specify Below**)
- ☐ 065 Premises Liability
- ☐ 078 Fen-phen/Redux Litigation
- ☐ 199 Silicone Implant

### TAX & MISCELLANEOUS REMEDIES

CASE TYPES:
- ☐ 007 Confessions of Judgment
- ☐ 008 Replevin
- ☐ 009 Tax
- ☐ 015 Condemnation
- ☐ 017 Detinue
- ☐ 029 Unemployment Compensation
- ☐ 031 Foreign Transcript
- ☐ 036 Administrative Review Action
- ☐ 085 Petition to Register Foreign Judgment
- ☐ 099 All Other Extraordinary Remedies

By: Chris Gair
_____
(Attorney)                    (Pro Se)

### COMMERCIAL LITIGATION

CASE TYPES:
- ☐ 002 Breach of Contract
- ☐ 070 Professional Malpractice
  (other than legal or medical)
- ☒ 071 Fraud (other than legal or medical)
- ☐ 072 Consumer Fraud
- ☐ 073 Breach of Warranty
- ☐ 074 Statutory Action
  (Please specify below.**)
- ☐ 075 Other Commercial Litigation
  (Please specify below.**)
- ☐ 076 Retaliatory Discharge

### OTHER ACTIONS

CASE TYPES:
- ☐ 062 Property Damage
- ☐ 066 Legal Malpractice
- ☐ 077 Libel/Slander
- ☐ 079 Petition for Qualified Orders
- ☐ 084 Petition to Issue Subpoena
- ☐ 100 Petition for Discovery

** _____

_____

Primary Email: docketing@gairlawgroup.com

Secondary Email: cgair@gairlawgroup.com

Tertiary Email: _____

**Pro Se Only:** ☐ I have read and agree to the terms of the *Clerk's Office Electronic Notice Policy* and choose to opt in to electronic notice
form the **Clerk's Office** for this case at this email address: _____

## IRIS Y. MARTINEZ, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

FILED
3/16/2022 11:14 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL

FILED DATE: 3/16/2022 11:14 AM    2022L002556

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT – LAW DIVISION**

| | |
|---|---|
| CF ENTERTAINMENT, INC., a California corporation; ENTERTAINMENT STUDIOS NETWORKS, INC., a California corporation; WEATHER GROUP, LLC, a Delaware limited liability company; and WEATHER GROUP TELEVISION, LLC, a Georgia limited liability company,<br><br>    Plaintiffs,<br><br>  v.<br><br>THE NIELSEN COMPANY (US), LLC, a Delaware limited liability company,<br><br>    Defendant. | **CASE NO.** 2022L002556<br><br><br>**COMPLAINT FOR FRAUD**<br><br><br>**JURY TRIAL DEMANDED** |

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................ 1

PARTIES ........................................................................................................... 4

JURISDICTION AND VENUE ........................................................................ 5

FACTS COMMON TO ALL CAUSES OF ACTION ...................................... 5

     A.   Nielsen Has Been the Dominant TV Ratings Agency for Over 50 Years .............. 6

     B.   Entertainment Studios Launches Seven Networks ................................. 7

     C.   Nielsen Begins Rating the ESN Networks........................................... 8

     D.   Nielsen Conceals That Its Ratings Services Are Unreliable .......................... 9

     E.   The COVID-19 Pandemic Prompts the Television Industry to Scrutinize Nielsen ................................................................. 10

     F.   The MRC's May 2021 Findings And Nielsen's Response ................................... 11

     G.   The MRC's Findings Confirm the Unreliability of Ratings of the ESN Networks ................................................................. 13

     H.   Nielsen Also Provides Fundamentally Unreliable Ratings for The Weather Channel ................................................................. 15

PRAYER FOR RELIEF .................................................................................. 19

FILED DATE: 3/16/2022 11:14 AM   2022L002556

FILED DATE: 3/16/2022 11:14 AM    2022L002556

## INTRODUCTION

1.      This lawsuit is about Nielsen's outdated, unreliable and broken television ratings service, and the resulting harm suffered by media companies who rely on Nielsen to sell ad time. Industry experts widely agree that Nielsen's ratings service is outdated and unreliable:

- A former high-level Nielsen executive publicly acknowledged that Nielsen's ratings service is "outdated."

- David Zaslav, CEO of Discovery, Inc., referred to Nielsen as "very antiquated."

2.      In September 2021, Nielsen's regulator suspended its accreditation in an unprecedented action.  Months later, Nielsen acknowledged that it undercounted out-of-home viewers during a 16-month period from September 2020 to December 2021.  It is estimated that Nielsen's undercounting of out-of-home viewers resulted in 60 billion lost impressions causing over $700 million in lost ad revenue for the industry.

3.      Nielsen then reported that it failed to capture more than 41 million viewers who watched Super Bowl LVI in February 2022.

4.      Even Nielsen's CEO, David Kenny, in an obvious understatement, admitted that "We haven't been perfect."

5.      Plaintiffs own and operate television networks that are widely distributed by multi-channel video programming distributors.  Plaintiffs earn advertising revenue by selling air time to marketers.  Plaintiffs pay millions of dollars in fees for Nielsen to rate their networks and sell ad time based on those ratings.

6.      Defendant Nielsen Company (US), LLC ("Nielsen") is a global television ratings firm.  Its ratings data has been used as the trading currency for the $70 billion national and local TV advertising marketplace in the United States, meaning that advertisers accept Nielsen's ratings as the basis for paying media companies to advertise on their networks and programs.

7.      Nielsen is the most well-known television ratings service providers in the country,

FILED DATE: 3/16/2022 11:14 AM   2022L002556

but it relies on an antiquated panel system to estimate television viewership. This is a crude tool that does not reliably measure television viewership in the Twenty-First Century.

8.       Nielsen's panel system may have worked decades ago when there were a handful of networks that could be viewed only over the air on a television set. With changes in the television industry, viewers now have hundreds of channels to choose from. They can watch video by subscribing with distributors, such as satellite or cable providers, or stream over the Internet through services and apps that can be viewed on Smart TVs, computers, cell phones and tablets.

9.       This fragmentation of viewership has eroded the reliability of Nielsen's panel system. Nielsen has known about the problems for years but has not invested to make its ratings system reliable and up-to-date.

10.     Nielsen got away with this because, for decades, the ratings generated by Nielsen's panel system have been the "currency" in the television advertising market. Nielsen has not ever had any real competition. As a monopoly, Nielsen grew into a behemoth, earning billions in revenue each year.

11.     This monopoly position allowed Nielsen to dominate the market without developing new and improved ratings services to keep up with the rapidly changing market for television networks and programming. Nielsen continues to do business the old-fashioned way.

12.     Nielsen knew that, based on the limitations of its panel system and the increased fragmentation of television viewership, it could not reliably rate smaller networks. Nielsen concealed this highly material fact from Entertainment Studios.

13.     The networks owned and operated by Entertainment Studios were in that category in 2017 when Nielsen caused Entertainment Studios to pay Nielsen to rate the networks. Nielsen intentionally misrepresented that its panel system was reliable and would be a valuable service for Entertainment Studios.

14.     Nielsen also made false promises and told half-truths to obtain millions in fees to rate The Weather Channel.

15.     Based on Nielsen's false representations, half-truths, and concealment, Nielsen

FILED DATE: 3/16/2022 11:14 AM  2022L002556

received millions in fees per year to provide fundamentally unreliable and flawed services.

16.     Plaintiffs recently discovered Nielsen's fraudulent practices when the COVID-19 pandemic exposed Nielsen and its panel system as fundamentally flawed and completely unreliable.  The Media Rights Council ("MRC")—an independent organization charged with regulating Nielsen—found that Nielsen's panel system significantly underreported television viewership, costing media companies billions in lost revenue.

17.     The Video Advertising Bureau ("VAB")—an industry group that represents major television networks owned by NBCUniversal, ViacomCBS, Fox, Disney A+E Networks and others—then demanded that the MRC suspend its accreditation of Nielsen's national ratings service due to Nielsen's flawed panel system.

18.     Sean Cunningham, the VAB's President and CEO, wrote that the "compounded failures by Nielsen in not preserving the integrity of their national panel is continuing to damage their largest clients and the TV Video buy/sell marketplace as a whole—and thus requires the MRC intervention of suspending accreditation of Nielsen's national rating service ASAP."

19.     After these statements by the VAB, the MRC conducted an audit of Nielsen's panel system and announced that it was "actively pursuing these issues."

20.     In response, Nielsen submitted formal notice to the MRC that it was taking a "hiatus" from MRC oversight.  Nielsen made this decision because the MRC was preparing to strip Nielsen of its accreditation.  Nielsen submitted its notice shortly before the MRC's Television Committee was set to discuss the reliability of Nielsen's panel system ratings.

21.     In August 2021, the MRC's board took unprecedented action and stripped Nielsen of its accreditation for both local and national TV measurement.

22.     Nielsen has known about these problems for years, yet it continued to cause media companies like Plaintiffs to spend millions for its worthless ratings services. Nielsen is now scrambling to address the serious concerns raised by its media company customers, but the damage has already been done for companies like Plaintiffs.

23.     Plaintiffs are not alone.  Many other media companies have been led astray and

FILED DATE: 3/16/2022 11:14 AM    2022L002556

have paid millions of dollars to Nielsen in exchange for unreliable and flawed services. It is estimated that Nielsen caused these media companies billions of dollars in damages.

24.     David Zaslav, the CEO of Discovery, Inc., recently stated that the industry needs "better data" than what Nielsen provides through its "very antiquated delivery system." He went on to state: "It's one thing if you have an antiquated system and then you augment it. But the antiquated system itself is unreliable." Zaslav's views are widely shared in the industry and are, in fact, true.

25.     Kelly Abacarian, a former high-level Nielsen executive, recently stated that the industry needs better solutions than the "outdated" measurement system provided by Nielsen. Ms. Abcarian left Nielsen in April 2021 after spending 16 years at the company, where she was the General Manager and Head of Product Advances Video Advertising.

26.     Under the law, Nielsen was required to be upfront and honest with Plaintiffs, but, as alleged herein, Nielsen chose otherwise based on cheapness and greed. By this action, Plaintiffs seek to remedy the harm caused by Nielsen's fraudulent conduct.

## **PARTIES**

27.     CF Entertainment, Inc. ("CF Entertainment") is a California corporation with its principal place of business located at 1925 Century Park East, 10th Floor, Los Angeles, California 90067.

28.     Entertainment Studios Networks, Inc. ("ESN") is a California corporation with its principal place of business located at 1925 Century Park East, 10th Floor, Los Angeles, California 90067. CF Entertainment and ESN are referred to collectively herein as "Entertainment Studios."

29.     Weather Group, LLC is a Delaware limited liability company. Its members are TV Holdings 1, LLC and TV Holdings 2, LLC, which are both Delaware limited liability companies. TV Holdings 1, LLC and TV Holdings 2, LLC are wholly owned by Entertainment Studios Media Holdings, Inc., a Delaware corporation with its principal place of business located at 1925 Century Park East, 10th Floor, Los Angeles, California 90067.

30.     Weather Group Television, LLC is a Georgia limited liability company. It is

FILED DATE: 3/16/2022 11:14 AM   2022L002556

wholly owned by Weather Group, LLC.  Weather Group, LLC and Weather Group Television, LLC are referred to collectively as "Weather Group."

31.     The Nielsen Company (US), LLC ("Nielsen") is a Delaware limited liability company that is headquartered in New York.  Nielsen is a wholly-owned subsidiary of ACNielsen Corporation, which is its sole member.  ACNielsen Corporation is incorporated under the laws of the State of Delaware and has its principal place of business in New York.

## JURISDICTION AND VENUE

32.     This Court has personal jurisdiction over Nielsen because Nielsen so agreed in the Nielsen Syndication Service, Combined National-Local Service Agreement between CF Entertainment and Nielsen dated April 12, 2007 (the "2007 Nielsen Contract").[1]  Per Section 9(i) of the 2007 Nielsen Contract, Nielsen agreed "to the exclusive personal jurisdiction of the State and Federal courts located in Chicago, Illinois for purposes of determining all disputes . . . ."

33.     Venue is proper pursuant to 735 ILCS 5/2 101 because a substantial part of the events which give rise to this action occurred in this County and because Nielsen agreed to "waive all objections to venue" in this Court per Section 9(i) of the 2007 Nielsen Contract.

## FACTS COMMON TO ALL CAUSES OF ACTION

34.     Entertainment Studios was founded in 1993 by media entrepreneur Byron Allen.  Initially, Entertainment Studios produced non-fiction television shows, including interview series (such as *Entertainers with Byron Allen*) and court television.  These shows were distributed via broadcast television syndication, which is the process of licensing shows directly to local broadcast stations.

35.     Entertainment Studios earned license fees from these local broadcast affiliates, but the vast majority of Entertainment Studios' revenue came from ad sales.  Per its syndication

---

[1] The parties to the 2007 Agreement are CF Entertainment, Inc. and Nielsen Media Research, Inc.  Nielsen Company (US), LLC entered into amendments to the 2007 Agreement.  Those amendments state that The Nielsen Company (US), LLC is the successor-in-interest to Nielsen Media Research, Inc.  This Complaint refers to both The Nielsen Company (US), LLC and Nielsen Media Research, Inc. as "Nielsen."

FILED DATE: 3/16/2022 11:14 AM    2022L002556

agreements with broadcast affiliates, Entertainment Studios sold ad time to companies who advertised during the broadcast of Entertainment Studios' programming.

36.     Like most broadcasters, the price Entertainment Studios can charge for ad time turns primarily on the number of viewers who watch a show (and, thus, who watch the commercials aired during that show).  Advertisers typically are not obligated to pay for a commercial unless the television media company provides proof of performance, *i.e.*, evidence of the number of viewers watching the show at the time a commercial aired.

37.     Historically, most advertisers have required Nielsen's ratings as proof of performance.

**A.      Nielsen Has Been the Dominant TV Ratings Agency for Over 50 Years**

38.     Nielsen was founded in Chicago, Illinois in 1923, and has been measuring television audiences since 1950. Nielsen was the dominant TV ratings agency in the first televised presidential debate between John F. Kennedy and Richard Nixon during the 1960 U.S. presidential election.  The Nielsen ratings showed that over 70 million people watched the debate, which many commentators believe predicted the outcome of the election given President Kennedy's performance.

39.     Since it began measuring television audiences over 70 years ago, Nielsen has used a research panel of randomly chosen television viewers across the country to estimate U.S. television viewership.  That is, in order to report television ratings, Nielsen recruits households of television viewers to serve on a research panel.

40.     Nielsen provides these households (so-called "Nielsen families") with hardware designed to track viewership, which includes a "black box" and a separate remote control called a "people meter."  Nielsen pays these Nielsen families to log in when they watch TV and to use the Nielsen "people meter" to record which family member was actually watching TV and what they were watching.

41.     The panel purports to represent the TV viewership of the entire nation.  The panel is a tiny fraction of the U.S. population—less than one percent—yet Nielsen uses the panel data to

FILED DATE: 3/16/2022 11:14 AM    2022L002556

estimate total viewership.

42. The number of households in Nielsen's research panel has increased over time, but remains very small. In 1985, Nielsen's research panel consisted of 5,500 households. In 2003, Nielsen expanded its research panel to 10,000 households. Today, the number of households in Nielsen's research panel is approximately 40,000 households in a country of over 330 million people.

43. The product Nielsen delivers to its customers is a periodic report that contains ratings figures. Nielsen presents its ratings figures as a percentage of the national television audience.

**B.** **Entertainment Studios Launches Seven Networks**

44. In 2009, Entertainment Studios launched six high-definition cable television networks: Comedy.TV, Recipe.TV, MyDestination.TV, ES.TV, Pets.TV, and Cars.TV. In 2012, Entertainment Studios launched a seventh high-definition cable television network: JusticeCentral.TV. These seven networks are referred to herein as the "ESN Networks."

45. At the time of launch, the ESN Networks had limited distribution. Most of the major multi-channel video programming distributors ("MVPDs")—such as Comcast, Charter, DirecTV, etc.—did not carry the ESN Networks. Entertainment Studios did not pay Nielsen to rate these networks for the first several years.

46. Given the limited distribution of the ESN Networks, Entertainment Studios was reluctant to pay the fees Nielsen would charge to rate these networks. Nielsen's sales representatives continued to press, however, and advocated for Entertainment Studios to pay Nielsen to rate these networks.

47. Ultimately, Nielsen convinced Entertainment Studios to add the ESN Networks to the 2007 Nielsen Contract, as amended.

48. The contract negotiations began in or about December 2016 and ended in or about August 2017. Nielsen representatives, including Mitch Barns (CEO) and Kush Tulsidas (VP, Client Solutions), spoke with Entertainment Studios' representatives, including Byron Allen

FILED DATE: 3/16/2022 11:14 AM    2022L002556

(Founder, Chairman and CEO of Entertainment Studios), during those negotiations.

49.     During the negotiations, Nielsen representatives, including Mr. Barns and Mr. Tulsidas, told Entertainment Studios, including Mr. Allen, that Nielsen's ratings services would be worthwhile, appropriate, reliable and a good investment for Entertainment Studios' networks. These representations were, and are, false and were made with the intent to mislead Entertainment Studios.

50.     During the negotiations, Nielsen representatives, including Mr. Barns and Mr. Tulsidas, told Entertainment Studios, including Mr. Allen, that the ESN Networks had attained sufficient distribution and viewership for Nielsen to reliably rate them.

51.     In reliance upon these representations, Entertainment Studios agreed to add the ESN Networks to the 2007 Nielsen Contract, as amended, and pay significant fees to Nielsen to rate the networks.

52.     Shortly thereafter, Nielsen issued a press release claiming that Nielsen was providing Entertainment Studios with its "best-in-class measurement" services, and that Nielsen's ratings reports would deliver "enhanced value to Entertainment Studios during the media buying and selling process."

**C.     Nielsen Begins Rating the ESN Networks**

53.     In 2017, Nielsen began providing ratings reports to Entertainment Studios for the ESN Networks. Entertainment Studios knew from its own internal data that it had viewership on its networks, especially during the prime advertising slots. It expected that Nielsen would capture this viewership in its reports, which should have allowed Entertainment Studios to generate substantial ad revenue.

54.     However, Nielsen did not capture these viewers for much of the reporting period and for many of the primetime slots. Because advertisers condition payments for commercials on the number of viewers who watch commercials, Nielsen's failure to capture viewership on the ESN Networks damaged Entertainment Studios.

55.     When Entertainment Studios complained to Nielsen about its failures, Nielsen

dissembled, defending its panel model and boasting that it is the "gold standard" in the industry. Nielsen did not disclose what it already knew—that its ratings services were fundamentally unreliable.

### D.  Nielsen Conceals That Its Ratings Services Are Unreliable

56.   Nielsen did not tell Entertainment Studios the truth—that, in reality, its ratings services were not reliable for networks like those owned by Entertainment Studios. At the time, Entertainment Studios did not have access to information that would show that Nielsen's data was unfounded and false.

57.   Entertainment Studios did not have access to, and did not know, that Nielsen's ratings would fail to capture viewership on ESN Networks. Had Entertainment Studios known this, it would not have paid millions of dollars in fees to Nielsen.

58.   However, Nielsen's inability to reliably rate Entertainment Studios' networks was well known within Nielsen. On information and belief, Nielsen employs teams of statisticians who keep track internally of statistical data that can affect the accuracy and reliability of Nielsen's data.

59.   Through these internal reviews, Nielsen knew that its ratings services were unreliable, especially for networks like those owned by Entertainment Studios. Nielsen knew that, when distribution for a network is limited in the number of subscribers, the sample errors in Nielsen's reports increase dramatically making the service fundamentally unreliable.

60.   The greater the sample error, the more likely it is that the viewership reported by Nielsen will differ significantly from the actual viewership, and the difference increases as the sample error increases. In other words, Nielsen knew that the errors in its data would be more frequent and larger for smaller companies like Entertainment Studios.

61.   Nielsen concealed this crucial information while taking in millions in fees from Entertainment Studios.

FILED DATE: 3/16/2022 11:14 AM    2022L002556

### E.    The COVID-19 Pandemic Prompts the Television Industry to Scrutinize Nielsen

62.     During the pandemic, media companies publicly complained that Nielsen was undercounting TV viewership across the entire industry.  These complaints revealed that Nielsen's research panel—already too small to capture modern TV viewership—had decreased in size even further due to an inability to go into the field to repair or replace hardware, or install hardware for new families who joined the panel.

63.     This led to Nielsen reporting significant drops in viewership despite the fact that the nation was under stay-at-home orders and that TV viewing was increasing.  This, in turn, caused TV networks to lose billions of dollars in advertising revenue and significantly tarnished Nielsen's reputation as the "gold standard."

64.     In May 2021, the Media Rights Council ("MRC") issued findings that Nielsen had undercounted viewers during the pandemic.  The MRC is an industry-funded organization that reviews and accredits ratings services like those Nielsen provides to television media companies.

65.     In the 1960s, a U.S. Congressional Committee held hearings regarding the accuracy of audience research services and considered regulating the television and radio ratings business (*i.e.*, Nielsen).  Congress determined that, rather than move forward with government intervention, it would permit the television and radio industries to regulate themselves.  The Broadcast Rating Council (now known as the MRC) was the result of those hearings.

66.     Today, the MRC's activities include (1) setting forth minimum standards for ratings services; (2) accrediting ratings services based on information provided by providers of those services; and (3) using independent accounting firms to annually audit ratings services.  Providers of ratings services pay for the audits.

67.     The MRC has standards with which ratings services must comply in order to be accredited by the MRC.  The MRC's standards include, among other things, disclosure standards, which require ratings agencies to disclose information about their ratings to their customers, the MRC and the accounting firms through which the MRC audits ratings services.

68. The MRC's annual audits allow the MRC to confirm that a ratings service merits accreditation based on its standards, and encourage ratings services to maintain and improve the quality of their service (or risk losing MRC accreditation).

69. The MRC's membership is comprised of media organizations that rely on or use ratings services. Nielsen, and other providers of ratings services, are not members. Among MRC's members are large television media companies, including:

    a.     ABC Network;

    b.     CBS Corporation;

    c.     Disney;

    d.     ESPN;

    e.     FOX Broadcasting;

    f.     MSNBC;

    g.     NBC Universal;

    h.     Sony Pictures Television;

    i.     Time Warner;

    j.     Turner Broadcasting; and

    k.     Viacom Media Networks.

70. The MRC's role as a regulator of Nielsen is particularly important in light of Nielsen's power over the television ratings industry. But the MRC's role as a regulator of Nielsen is only effective to the extent that Nielsen provides the MRC and its auditors with a full, accurate and honest picture of its ratings processes and data.

**F.**     **The MRC's May 2021 Findings And Nielsen's Response**

71. The MRC's May 2021 findings that Nielsen underreported TV viewership during the pandemic created a big problem for Nielsen. Because of the MRC's role as regulator, a public statement by the MRC indicating that Nielsen had underreported viewers drew significant attention, both from the media and from the television media companies that pay Nielsen for its ratings reports; and the MRC's findings prompted the VAB to demand that the MRC suspend its

FILED DATE: 3/16/2022 11:14 AM    2022L002556

FILED DATE: 3/16/2022 11:14 AM   2022L002556

accreditation of Nielsen's ratings service.

72.    The MRC's May 2021 findings were particularly threatening to Nielsen because competitors have recently arisen who now offer an alternative to Nielsen's ratings service. As one example, Comscore advertises its measurements as a more precise and more reliable alternative to traditional television measurement services (*i.e.*, Nielsen's research panel). Rather than relying on a research panel, Comscore relies on data from over 75 million set-top boxes in over 30 million households nationwide to determine the number of viewers of a particular television show.

73.    That is, Comscore recognizes that, in recent years, the way in which the national television audience views content has changed. Because the television audience now views cable television networks via set-top boxes, data from those set-top boxes can be used to determine the number of people who watched a particular cable television network at a particular time. Nielsen could have done this years ago but didn't to avoid incurring the expense.

74.    Nielsen is now scrambling to address the unreliability of its ratings. For example, Nielsen announced new audience measurement initiatives, including efforts to measure out-of-home viewing. But it is too little, too late.

75.    The industry is fed up with Nielsen's antiquated system. In response to the demand by the VAB to pull Nielsen's accreditation, the MRC acknowledged it was conducting an audit of Nielsen's panel system and was "actively pursuing these issues."

76.    In response, Nielsen submitted formal notice to the MRC that it was taking a "hiatus" from MRC oversight. Nielsen made the decision to take a "hiatus" because the MRC was preparing to strip Nielsen of its accreditation. Nielsen submitted this notice shortly before the MRC's Television Committee was set to address the reliability of Nielsen's ratings.

77.    Nielsen's attempt to avoid scrutiny is an admission that its system is fundamentally flawed and unreliable. David Zaslav, the CEO of Discovery, Inc., recognized that the industry needs "better data" than what Nielsen provides through its "very antiquated delivery system." He stated: "It's one thing if you have an antiquated system and then you augment it. But the antiquated system itself is unreliable." Zaslav's views are widely shared among media companies and their

FILED DATE: 3/16/2022 11:14 AM   2022L002556

executives.

78.     Other industry executives agree with Mr. Zaslav's statements, including a top executive at NBCUniversal who left Nielsen in April 2021 after 16 years.  Kelly Abcarian, Executive Vice President of Measurement & Impact at NBCUniversal published an article in which she referred to Nielsen as relying on "outdated metrics." Ms. Abcarian said that the industry needs "multiple yardsticks" and that NBCUniversal has decided to develop its own internal data and measurements.

79.     It gets worse.  Nielsen has admitted undercounting out-of-home viewers in its national ratings service from September 2020 to December 2021.  The industry estimates that these failures caused approximately 60 billion lost TV impressions and $700 million in revenue.  The VAB reports that 33 networks were affected, which suffered in total 3.7 billion lost impressions per month, one billion of which was in primetime.

80.      Nielsen also failed to capture 41 million viewers for the Super Bowl in February 2022.  Nielsen originally reported that 167 million viewers watched the Super Bowl.  But in reality, more than 208 million people watched the Super Bowl—25% higher than what Nielsen originally reported.

81.     Nielsen's customers are making plans to use alternate measurement services.  NBCUniversal has announced that it will use iSpot.tv to track viewership for the Olympics.  ViacomCBS is working with VideoAmp to create a competitive service.

82.     Nielsen has resorted to filing lawsuits to prevent this competition.  Nielsen recently filed patent infringement lawsuits against ratings upstarts HyphaMetrics and TVision to block competitive services.

G.     **The MRC's Findings Confirm the Unreliability of Ratings of the ESN Networks**

83.     The MRC's recent findings caused Plaintiffs to investigate whether there were any similar problems with respect to the ratings of their networks.  Plaintiffs' investigation showed that Nielsen provided Plaintiffs with ratings that were fundamentally flawed and resulted in

FILED DATE: 3/16/2022 11:14 AM    2022L002556

considerable underreporting of viewership.

84.      Plaintiffs found that Nielsen's panel system has become more unreliable for most networks each year since Nielsen last expanded its panel in 2016.  As of April 2021, over 79% of all cable network individual half hour ratings had a sample error (or "Relative Error") of over 50%.

85.      That means that Nielsen's ratings could be reporting less than half of the actual television viewership for the vast majority for all of its ratings in 2021.  This increase in unreliability of Nielsen's ratings is shown by the chart below:



86.      The unreliability in Nielsen's ratings is even worse for smaller networks because there is an inverse relationship between viewership and sample error: the lower the viewership, the higher the sample error.

87.      Plaintiffs' investigation also found that Nielsen likely provided fundamentally unreliable and flawed ratings to the following networks: American Heroes TV; AMTV; AXS TV; Baby First TV; BET; BET Her; Big Ten Network; Cleo TV; CNN En Español; Destination America; Discovery Life Channel; FETV; FUSE; Great American Country; Hallmark Drama; LOGO; Newsy; Ovation; Pursuit Channel; RFD; and Smithsonian.

88.      The chart below shows the television networks that received ratings from Nielsen with over 50% sample error.  The vertical axis shows the percentage of time slots that Nielsen

FILED DATE: 3/16/2022 11:14 AM    2022L002556

rated the network with over 50% sample error–as the chart shows, it was over 90% of the time. Many of these networks received ratings with over 50% sample error for every period (100%).



89.    It is estimated that these networks have suffered billions of dollars in damages as a result of Nielsen's flawed ratings services; and yet Nielsen, in turn, has earned billions of dollars in revenue from these networks.

**H.    Nielsen Also Provides Fundamentally Unreliable Ratings for The Weather Channel**

90.    In 2018, Entertainment Studios acquired Weather Group, which owns and operates The Weather Channel.

91.    For nearly four decades, The Weather Channel has been the leader in weather coverage, providing the most comprehensive analysis of any media outlet. For eleven years in a row, The Harris Poll has ranked The Weather Channel as the "TV News Brand of the Year," recognizing The Weather Channel as the most trusted brand in cable news.

92.    In years past, before the rise of streaming and the fragmentation of TV viewership, The Weather Channel had a sufficiently large viewership such that Nielsen could reliably rate the network.

FILED DATE: 3/16/2022 11:14 AM    2022L002556

93. But with the rise of streaming, viewership for The Weather Channel, like other TV networks, has eroded. Unbeknownst to Plaintiffs until very recently, this erosion has led to Nielsen not being able to reliably rate even The Weather Channel.

94. For example, by 2021, the sample error was over 50% for most of the timeslots reported by Nielsen for The Weather Channel. In other words, more often than not, Nielsen could not report data for the Weather Channel that had a minimum degree of reliability.

95. This has further led to Nielsen dramatically underreporting viewership on The Weather Channel.

96. Nielsen knew that this would happen, but Nielsen chose to conceal these facts to continue receiving millions of dollars in fees annually to rate The Weather Channel.

## <u>COUNT I</u>

### **FRAUD (INTENTIONAL MISREPRESENTATION/CONCEALMENT)**

### **(By Plaintiffs Against Nielsen)**

97. Plaintiffs incorporate each of the foregoing and subsequent paragraphs as though fully set forth herein.

98. As alleged herein, Nielsen received millions of dollars in fees to rate Entertainment Studios' networks based on false promises that Nielsen would provide reliable and valuable ratings services.

99. The contract negotiations began in or about December 2016 and ended in or about August 2017. Nielsen representatives, including Mitch Barns (CEO) and Kush Tulsidas (VP, Client Solutions), spoke with Entertainment Studios' representatives, including Byron Allen (Founder, Chairman and CEO of Entertainment Studios), during those negotiations.

100. During those negotiations, Nielsen representatives, including Mr. Barns and Mr. Tulsidas, told Entertainment Studios, including Mr. Allen, that Nielsen's ratings services would be worthwhile, appropriate, reliable and a good investment for Entertainment Studios' networks. These representations were, and are, false.

101. During those negotiations, Nielsen representatives, including Mr. Barns and Mr.

FILED DATE: 3/16/2022 11:14 AM   2022L002556

Tulsidas, told Entertainment Studios, including Mr. Allen, that the ESN Networks had attained sufficient distribution and viewership for Nielsen to reliably rate them.

102.    In reliance upon these representations, Entertainment Studios agreed to add the ESN Networks to the 2007 Nielsen Contract, as amended, and pay significant fees to Nielsen to rate the networks.

103.    These representations were material, false and misleading because Nielsen's ratings services are fundamentally unreliable for networks like the ESN Networks.

104.    Nielsen knew that its representations were false and misleading, but made them anyway with the intent of causing Entertainment Studios to detrimentally rely by paying Nielsen exorbitant fees.

105.    Nielsen's misrepresentations were intentional.  Entertainment Studios reasonably and justifiably relied thereon and would not have paid Nielsen millions in fees for fundamentally unreliable and flawed ratings services and were damaged as a result.

106.    Nielsen's misrepresentations and half-truths also imposed on Nielsen a duty to disclose information that it had in its possession to ensure that its representations were fully accurate.  Nielsen also assumed a duty to disclose based on the fact that Nielsen agreed to comply with MRC standards, which include disclosure requirements, in providing services to Plaintiffs and other media companies.

107.    While under a duty to disclose, Nielsen did not tell and concealed from Plaintiffs that:  (1) its ratings service could not reliably rate Plaintiffs' networks; and (2) Nielsen's ratings services would become much more unreliable for all of Plaintiffs' networks including The Weather Channel.

108.    Nielsen knew this information and could have, and should have, disclosed it to Plaintiffs.  But Nielsen intentionally withheld this information, intending for Plaintiffs to rely to their detriment.

109.    These concealed facts were highly material and critical to Plaintiffs and their business.

FILED DATE: 3/16/2022 11:14 AM    2022L002556

110.    Plaintiffs reasonably and justifiably relied on Nielsen's statements and omissions. Had Nielsen disclosed what the law requires, Plaintiffs would not have paid Nielsen millions of dollars in fees.

111.    As a result, Plaintiffs suffered damages.  Plaintiffs' damages include millions of dollars in fees paid to Nielsen for shoddy and unreliably services, millions of dollars in lost advertising revenue and profits, lost business value and other consequential harms that are estimated to be in the billions of dollars.  Plaintiffs seek compensatory, special and consequential damages in an amount that will conform to proof at trial.

## COUNT II

### REFORMATION OF CONTRACT

### (By Plaintiffs Against Nielsen)

112.    Plaintiffs incorporate each of the foregoing and subsequent paragraphs as though fully set forth herein.

113.    Under Illinois law, reformation of a contract is permissible when parties reach agreement but, through a mutual mistake that relates to a fundamental part of the parties' agreement, a variance exists between the parties' agreement and the writing.

114.    Reformation is warranted here.  The agreement between Plaintiffs and Nielsen included, as a necessary and fundamental term, that Nielsen's ratings system would be accredited by the MRC.  The parties knew and understood that this MRC accreditation was fundamental to the contract and that Nielsen would receive the fees set forth in the contract in exchange for providing MRC accredited ratings services.

115.    Under Illinois law, reformation of a contract is also permissible when the error in drafting the agreement results from a unilateral mistake that was brought about through fraud. Reformation is warranted here for this reason as well.

116.    Plaintiffs therefore seek reformation of the parties' written agreements to provide that Plaintiffs are not required to pay the contract rates and, instead, will pay lower rates based on

FILED DATE: 3/16/2022 11:14 AM   2022L002556

the value of Nielsen's services provided without MRC accreditation.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for judgment as follows:

1.      For compensatory, special and consequential damages according to proof at trial;

2.      For costs and pre- and post-judgment interest;

3.      For reformation of contract pursuant to the Second Cause of Action above; and

4.      For such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury on all issues triable as of right by a jury.

DATED: March 16, 2022                 GAIR EBERHARD NELSON DEDINAS LTD

By:   _____
                                              Chris Gair
                                              Attorneys for Plaintiffs

CHRIS GAIR
cgair@gairlawgroup.com
GAIR EBERHARD NELSON DEDINAS LTD
1 East Wacker Drive
Chicago, Illinois  60601
Telephone:     (312) 600-4901

LOUIS R. MILLER (*pro hac vice application forthcoming*)
smiller@millerbarondess.com
DAVID W. SCHECTER (*pro hac vice application forthcoming*)
dschecter@millerbarondess.com
MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
Telephone:     (310) 552-4400
Facsimile:     (310) 552-8400